IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| RICHARD ROE, | Case No. 3:22-cv-01193-SB |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| CITY OF PORTLAND *et al.*, | |
| Defendants. | |

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Richard Roe ("Roe") filed this action against the City of Portland (the "City"), Amelia Flohr ("Flohr"), Joshua Dyk ("Dyk"), and Alexandra Ross ("Ross") (together, "Defendants"), alleging constitutional violations pursuant to 42 U.S.C. § 1983 ("Section 1983"). The Court has jurisdiction over Roe's claims pursuant to 28 U.S.C. § 1331, and all parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636.

Now before the Court is Defendants' motion for summary judgment. For the reasons explained below, the Court grants Defendants' motion.

///

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND[1]

Roe's claims arise out of interactions with Portland Police Bureau ("PPB") officers at a protest on August 14, 2020. (*See* Second Am. Compl. ("SAC") ¶¶ 8, 11, ECF No. 63.[2])

On August 14, 2020, Roe was playing a drum while marching in a protest in northeast Portland. (*See* Decl. John Burgess ("Burgess Decl.") Ex. 4 ("Roe Dep.") at 53:5-23, ECF No. 97.) After marching for approximately thirty minutes, PPB officers blocked the road on which the protestors were marching, causing the protestors to "navigate[] to the next street over" and continue marching. (*Id.* at 55:13-14.) The protestors stopped at the next intersection because lines of PPB officers blocked access to two of the intersection's streets. (*Id.* at 55:17-56:5.) PPB officers then "shot tear gas over [the protestors'] heads, . . . so there was smoke and tear gas behind [them]." (*Id.* at 56:14-18.) The group remained in place because officers blocked their path. (*Id.* at 66:13-17.)

The protestors immediately in front of the PPB officers formed a wall by standing side-by-side with large, flat objects. (*Id.* at 56:23-25; *see also* Decl. Alexandra Ross ("Ross Decl.") Ex. 11 at 1, ECF No. 87, "There was a large shield wall that consisted of [thirteen] or [fourteen] plywood shields with a large crowd of approximately 200-300 protesters behind them."[3]) Roe stood approximately fifteen to twenty-five feet behind the protestors' wall playing his drum. (*Id.*

---

[1] The court views the facts in the light most favorable to Roe, the non-moving party, and draws all reasonable inferences in his favor. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

[2] Roe also includes in the SAC allegations relating to interactions with PPB officers at a protest on August 9, 2020. (*See* SAC ¶¶ 9-11.) For the reasons discussed below, the Court grants Defendants' motion to strike Roe's allegations relating to the August 9, 2020 protest.

[3] Roe testified that that he could not tell if the protestors' "wall" was made of "poster boards or wood boards." (Burgess Decl. Ex. 4 at 58:2-5.)

at 66:7-10.) The PPB issued orders via a sound truck declaring the protest an unlawful assembly and ordering the protestors to disperse. (*See* Decl. Karl Klundt ("Klundt Decl.") Ex. 14 at 2, providing a record of the timing and content of each sound truck announcement on the relevant night, ECF No. 90.) Roe alleges that he was wearing earplugs and did not hear the unlawful assembly declaration or the orders to disperse. (*See* Roe Dep. at 73:21-74:2; *id.* at 79:2.)

After approximately five minutes, the officers "r[a]n and charge[d] the line of protestors . . . with clubs in hand . . . knock[ing] down people in front of them." (*Id.* at 66:16-24.) Flohr approached Roe "rais[ing] [her] baton to strike [him]."[4] (*Id.* at 67:2-3.) Roe lifted his arm and blocked Flohr's baton strike with his forearm. (*Id.* at 68:1-2.) Flohr then grabbed Roe and tripped, pulling him down on top of her. (*Id.* at 69:20-70:6.)

Roe tried to "get up off of [Flohr] as best [he] could, but . . . was tackled by other officers" who struck him with their batons. (*Id.* at 80:25-81:21.) During the struggle, Roe heard one officer ask whether they were going to arrest him, and a second officer responded that they were going to beat him where he was. (*Id.* at 67:9-14, Roe testified that he heard "a female officer's voice . . . say are we arresting him? . . . [Th]en [he] heard deeper, what appeared to be a male voice say, no, let's beat him right there.")

Roe then grabbed one of the officers' batons and attempted to use it to stand up and regain his footing. (*See id.* at 83:22-84:6.) After regaining his footing for "a second or two," he was "shoved [by] another officer from the back and fell . . . onto the ground." (*Id.* at 84:6-8.) The officers then arrested Roe. (*Id.* at 15-18, Roe testified that he "feared for [his] life, and tried to

---

[4] Flohr testified that Roe was the initial aggressor in their confrontation. (*See* Decl. Amelia Flohr ("Flohr Decl.") Ex. 1 at 1, ECF No. 86, "When I contacted [Roe], it was because he had initiated a fight with me by running toward me and punching me in the head.")

get away in any way that [he] could to avoid what appeared to be officers wanting to beat

[him][,] [a]nd then [he] was tackled further at that point, then [he] was arrested.")

Roe was charged with assaulting a public safety officer, interfering with a peace officer,

disorderly conduct in the second degree, and resisting arrest. (*See* Flohr Decl. Ex. 9 at 3, Flohr's

police report identifying charges against Roe; *see also* Roe Dep. at 102:12-13, Roe testified that

while officers were booking him following his arrest, the officers told him he was charged with

"assaulting an officer, something about a riot[,] [t]here were, like, four charges.") Roe alleges

that the charges were based on Flohr's false police report and statements. (*Id.* at 102:18.)

Although the district attorney subsequently dismissed the charges (*id.* at 175:11-14), a federal

grand jury indicted Roe on one count of civil disorder relating to the August 14, 2020 protest.

(*Id.* at 116:2-3; *id.* at 224:4-6.)

Both parties submitted video evidence which captures the events preceding the police

charging the protestors. (*See generally* Decl. Caroline Turco ("Turco Decl.") Exs. 2-4, ECF No.

84; Burgess Decl. Ex. 7.) The videos begin when the protestors had already formed a shield wall

which spanned across most, if not the entire length, of the street. (*See* Turco Decl. Ex. 2 at 0:01.)

The video's audio captures the PPB sound truck announcement ordering protestors to disperse

before the PPB officers approach the protestors. (*See id.* at 0:01-0:08.) The video reflects that

individuals from behind the protestors' wall were throwing items (one of which appears to be on

fire) at the officers. (*See id.* at 0:01-0:03.) The videos also depict that some protestors were

dispersing before and immediately after the officers charged the protestors' wall. (*See id.* at 0:04-

0:17.)

The video evidence does not capture the initial confrontations between Roe and Flohr.

The videos in the record begin capturing the confrontation between Roe and Flohr when Roe is

on top of Flohr on the ground.[5] (*See id.* at 0:17.) Roe appears to be grabbing Flohr while he is on

top of her, but the video does not clearly reflect that he is attempting to strike, punch, or attack

her. (*See id.*) One second later, another officer grabs Roe and pulls him off of Flohr. (*See id.* at

0:18.) The video reflects that Roe struggled with the officers and grabbed an officer's baton as he

stood up. (*See generally* Turco Decl. Ex. 4.) Although he appears to maintain his hold on the

baton despite another officer's attempts to pull it away, the officers ultimately brought him back

to the ground and restrained him. (*See generally* Turco Decl. Ex. 4.)

Roe testified that his physical injuries resulting from the August 14, 2020 protest

included "bruising[ on his knees,] . . . difficulty walking for maybe a day or two . . . [, and]

bruis[ing] on [his] back from [a] baton" and "[o]ther than that, . . . not anything significant."

(Roe Dep. at 119:20-21.) Roe did not require nor receive any medical treatment for his injuries.

(*See id.* at 121:5-22.)

On August 12, 2022, Roe filed this case against the City, Ariel Livingston, and three Doe

Defendants. (*See* Compl., ECF No. 1.) On September 1, 2022, Roe filed an amended complaint

against the City, Flohr, and five Doe Defendants. (*See* Am. Compl., ECF No. 3.) The Court

previously granted in part and denied in part Defendants' motion for judgment on the pleadings.

*See generally Roe v. City of Portland*, No. 3:22-cv-01193-SB, 2024 WL 3888705 (D. Or. Aug.

19, 2024) (dismissing Roe's claims relating to the August 9, 2020 protest with prejudice and

---

[5] Roe argues in his response that "[t]he footage . . . shows that Roe did not wind up and punch Officer Flohr" and "[t]he video confirms that Officer Flohr swung her baton at Roe, and that he raised his arm defensively[.]" (Pl.'s Resp. at 10, ECF No. 96.) At oral argument, however, Roe acknowledged that the video evidence in the record does not capture the initial confrontation between Roe and Flohr and only begins capturing the relevant events after Flohr brought Roe to the ground.

Roe's *Monell* claim without prejudice, and denying Defendants' motion relating to Roe's other claims).

On September 25, 2024, Roe filed the SAC. In the SAC, Roe asserts the following three claims against Flohr, Dyk, and Ross: (1) a Fourth Amendment excessive force claim, (2) a First Amendment retaliation claim, and (3) a Fourth Amendment false arrest claim. (*See* SAC ¶¶ 16-27, 41-58.) Roe also asserts a *Monell* claim against the City based on the officers' alleged excessive force. (*Id.* ¶¶ 28-40.) Defendants move to strike or dismiss portions of Roe's SAC and move for summary judgment on Roe's remaining claims. (*See generally* Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 83.)

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Rule 12(f)

Federal Rule of Civil Procedure ("Rule") 12(f) provides that a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). A matter is "immaterial" if it "has no essential or important relationship to the claim for relief or the defenses being plead." *Petrie v. Elec. Game Card, Inc.*, 761 F.3d 959, 967 (9th Cir. 2014) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994)). "Impertinent material," on the other hand, "consists of statements that do not pertain, and are not necessary, to the issues in question." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (quoting *Fantasy, Inc.*, 984 F.2d at 1527). Further, a matter is "scandalous" if "it generally refers to any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." *Ogdon v. Grand Canyon Univ. Inc.*, No.

2:22-cv-00477, 2023 WL 5046242, at *1 (D. Ariz. Aug. 8, 2023) (quoting *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 224 F.R.D. 261, 263 (D.D.C. 2004)).

Ultimately, "[t]he function of a [Rule] 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]" *Whittlestone, Inc.*, 618 F.3d at 973 (quoting *Fantasy, Inc.*, 984 F.2d at 1527) (simplified). "The disposition of a motion to strike is within the discretion of the district court." *Kim v. Beaverton Sch. Dist. 48J*, No. 3:20-cv-02025-SI, 2022 WL 594421, at *1 (D. Or. Feb. 28, 2022) (citing *Fed. Sav. & Loan Ins. Corp. v. Gemini Mgmt.*, 921 F.2d 241, 244 (9th Cir. 1990)).

### B.    Rule 12(c)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir. 2008) (quoting *Dunlap v. Credit Prot. Ass'n, L.P.*, 419 F.3d 1011, 1012 n.1 (9th Cir. 2005) (per curiam)). "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (simplified); *see also Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) (noting that "[t]he principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing" and the motions are "functionally identical"). In other words, as with a Rule 12(b)(6) motion, when evaluating a motion for judgment on the pleadings, "a court must assess whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Chavez*, 683 F.3d at 1108 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (simplified).

### C.    Rule 56

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *See Porter*, 419 F.3d at 891. The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## II.    ANALYSIS

### A.    Rule 12(f)

Defendants move to strike Roe's claims relating to the August 9, 2020 protest, on the ground that the Court previously dismissed those claims with prejudice. (*See* Defs.' Mot. at 15-16.) Roe's counsel acknowledged at oral argument that these claims are no longer at issue and that Roe included the claims in his SAC to preserve them for appeal.

Accordingly, the Court grants Defendants' motion to strike Roe's claims relating to the August 9, 2020 protest, on the ground that the Court previously dismissed those claims with prejudice. *See Hover v. Seattle-First Nat'l Bank*, No. 2:18-cv-00022, 2019 WL 1505947, at *1 (W.D. Wash. Apr. 5, 2019) ("The Court previously dismissed Plaintiffs' claims against [the relevant] Defendants . . . with prejudice and without leave to amend. Plaintiffs have not established a ground enabling them to re-allege their dismissed claims against these Defendants. Therefore, the motion to strike is GRANTED as to [the relevant] Defendants[.]"); *Avelar v. Rodriguez*, No. 2:16-cv-00471, 2019 WL 3400725, at *15 (C.D. Cal. Mar. 25, 2019) ("Courts

may strike a claim that was previously dismissed without leave to amend or that exceeds the scope of leave to amend.") (collecting cases), *report and recommendation adopted*, 2019 WL 3387647 (C.D. Cal. July 25, 2019).

## B.    Rule 12(c)

Defendants move for judgment on the pleadings relating to Roe's claims against Dyk and Ross on the ground that the statute of limitations bars those claims. (*See* Defs.' Mot. at 16-18.) Specifically, Defendants argue that "Defendant Dyk and Defendant Ross would not have understood they were an intended defendant in this case when plaintiff named John Does as defendants." (*Id.* at 16.) Although Roe does not address this argument in his briefing, the Court denies the motion for the same reasons explained in its earlier opinion.

Specifically, the Court previously denied Defendants' motion for judgment on the pleadings and rejected Defendants' argument that the statute of limitations bars Roe's claims against the Doe Defendants. *See Roe*, 2024 WL 3888705, at *8. The Court concluded that "Roe alleged sufficiently specific facts surrounding the takedown and use of force by the Doe Defendants to put them on constructive notice that they were the intended defendants in this action" and that "any PPB officer who took down Roe and struck him with a baton that evening should have understood that they were an intended defendant." *Id.* at *7 (citation omitted).

Defendants argue that Dyk and Ross "would not have understood they were an intended defendant in this case" because Dyk "took Roe down, but he did not use a baton" and "Ross struck Roe with a baton, but she did not take him down." (Defs.' Mot. at 16.) The Court disagrees. As the Court previously explained, "Roe allege[d] that '[m]ultiple other officers jumped on him, including Doe Defendants, striking him with their batons[.]'" *Roe*, 2024 WL 3888705, at *7 (emphasis omitted). Defendants misconstrue the Court's prior ruling to mean that only those officers who both took Roe down and struck him with a baton were on notice, but the

PAGE 9 – OPINION AND ORDER

Court's holding encompasses both officers who took Roe down and officers who struck him with a baton. *See id.* Consistent with its previous ruling, the Court concludes that "Roe alleged sufficiently specific facts surrounding the takedown and use of force by the Doe Defendants[,]" including Dyk and Ross, "to put them on constructive notice that they were the intended defendants in this action." *Id.* (citation omitted). Accordingly, the Court denies Defendants' motion for judgment on the pleadings relating to Roe's claims against Dyk and Ross.[6]

### C.    Rule 56

#### 1.    Excessive Force

Defendants move for summary judgment on Roe's Fourth Amendment excessive force claims. (*See* Defs.' Mot. at 18-22, 26-34.) With respect to the individual defendants, Defendants move for summary judgment on the grounds that the officers did not use excessive force and are entitled to qualified immunity. (*See id.* at 18-22, 26-27.) With respect to Roe's excessive force claim against the City, Defendants move for summary judgment on the grounds that Defendants did not violate Roe's constitutional rights and Roe has failed sufficiently to present or identify evidence supporting his *Monell* claim. (*See id.* at 28-34.)

#### a.    Individual Defendants

Defendants move for summary judgment on Roe's excessive force claims against the three individual defendants. (*See id.* at 18-22, 26-27.) In his response, Roe addresses only the relevant legal analysis relating to his excessive force claim against Flohr. (*See* Pl.'s Resp. at 17-23, addressing the *Graham* factors relating to Flohr's uses of force in a section titled "Officer

---

[6] In light of the Court's conclusion below that Defendants are entitled to summary judgment, the Court does not address Defendants' argument that Roe's claims against Dyk and Ross are untimely because Roe "had the names of the officers before he filed his initial pleading on August 12, 2022, and the insertion of John Does instead of the named officers was not any kind of mistake." (Defs.' Mot. at 17.)

Flohr's Use of Force on Roe Was Excessive and Unreasonable Under the Fourth Amendment.")
For the reasons explained below, the Court finds that Defendants are entitled to summary
judgment on Roe's excessive force claims against Flohr.[7]

### 1)    Applicable Law

"A police officer's use of . . . force on a person [is] a seizure subject to the
[reasonableness requirement of the] Fourth Amendment." *Hyer v. City & Cnty. of Honolulu*, 118
F.4th 1044, 1060 (9th Cir. 2024) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). In
evaluating a "claim of excessive force, [courts] ask whether the officers' actions were objectively
reasonable in light of the facts and circumstances confronting them." *Williamson v. City of Nat'l
City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (simplified) (quoting *Rice v. Morehouse*, 989 F.3d
1112, 1121 (9th Cir. 2021)); *see also Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 821
(9th Cir. 2023) (stating that *Graham* "provides the framework that governs this part of [the
analysis]").

Courts engage in a three-part inquiry to "determine whether an officer's actions were
objectively reasonable[.]" *Williamson*, 23 F.4th at 1151; *see also Ramsey v. City of Lake Havasu
City*, No. 23-3244, 2025 WL 66048, at *1 (9th Cir. Jan. 10, 2025) (recognizing that this circuit
"approach[es] an excessive force claim in three stages" (quoting *Thompson v. Rahr*, 885 F.3d
582, 586 (9th Cir. 2018))). First, courts consider "the severity of the intrusion on the individual's

---

[7] Roe's counsel clarified at oral argument that Roe did not intend to abandon his
excessive force claims against Dyk and Ross, but acknowledged that those claims relate to lesser
uses of force and are weaker than his claim against Flohr. In light of the similarities between the
Court's analysis relating to Roe's excessive force claims against Flohr and the analysis
applicable to Roe's claims against Dyk and Ross, Roe's failure directly to address the relevant
factors relating to Dyk and Ross in his briefing, and counsel's acknowledgement at oral
argument, the Court also finds that Defendants are entitled to summary judgment regarding
Roe's excessive force claims against Dyk and Ross for the reasons discussed herein.

Fourth Amendment rights by evaluating the type and amount of force inflicted[.]" *Williamson*, 23 F.4th at 1151 (quoting *Rice*, 989 F.3d at 1121); *Thompson*, 885 F.3d at 586 (same). Second, courts consider "the government's interest in the use of force[.]" *Williamson*, 23 F.4th at 1151 (quoting *Rice*, 989 F.3d at 1121). Third, courts consider "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Id.* (quoting *Rice*, 989 F.3d at 1121). Ultimately, courts must "judge the reasonableness of a particular use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]'" *id.* (quoting *Rice*, 989 F.3d at 1121, which quoted *Graham*, 490 U.S. at 396), and keep in mind that "police officers 'are not required to use the least intrusive degree of force possible.'" *Id.* (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (en banc)).

### a)    Type and Amount of Force

The Court must first consider the severity of the intrusion on Roe's Fourth Amendment rights. *See Williamson*, 23 F.4th at 1151 (identifying this initial step in a court's inquiry). "To gauge the type and amount of force used, [courts] assess both 'the risk of harm and the actual harm experienced.'" *Sabbe*, 84 F.4th at 821 (quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012)). In considering the "specific factual circumstances" and "classifying the force used," courts also assess the "nature and degree of physical contact[.]" *Williamson*, 23 F.4th at 1151-52 (stating that these matters are "relevant to th[e] analysis" (first quoting *Lowry*, 858 F.3d at 1259; and then citing *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994))).

### b)    Government Interest

"The Supreme Court's decision in *Graham* identified several factors to consider when evaluating the strength of the government's interest in the force used[.]" *Williams v. City of Sparks*, 112 F.4th 635, 643 (9th Cir. 2024); *see also Hart v. City of Redwood City*, 99 F.4th 543,

549 (9th Cir. 2024) (applying the *Graham* factors). The *Graham* factors are: "(1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Williams*, 112 F.4th at 643 (quoting *Graham*, 490 U.S. at 396).

"The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety[,]" *id.* (quoting *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019)), but the *Graham* "factors are not exclusive." *Id.* (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). Courts "still must 'examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Id.* (quoting *Bryan*, 630 F.3d at 826). Such "factors may include the availability of less intrusive force[ or] whether proper warnings were given[.]" *Id.* (quoting *Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017)).

### c)    Balance

The Court's third and final consideration is "the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Williamson*, 23 F.4th at 1151.

### 2)    Recent Ninth Circuit Authority

The Ninth Circuit recently addressed similar claims against law enforcement officers following the use of intermediate force during protests. *See Chairs v. City of Seattle*, 145 F.4th 1233, 1243-46 (9th Cir. 2025); *Puente v. City of Phoenix*, 123 F.4th 1035, 1057-62 (9th Cir. 2024).

///

///

///

### a)    *Cheairs*

In *Cheairs*, the plaintiff asserted, *inter alia*, a Fourth Amendment excessive force claim based on a law enforcement officer's use of intermediate force at a protest in Seattle, Washington. *See Cheairs,* 145 F.4th at 1235.

The protest in *Cheairs* had "devolved into 'a riot'" with "[s]ome protesters . . . holding plywood shields with nails in them concealed by paint, and . . . throwing bottles, rocks, and fireworks at the police line." *Id.* at 1237. "Using a public address system, [the Seattle Police Department ("SPD")] broadcast several orders for the crowd to immediately disperse" and "warned those in the crowd that they would be subject to arrest [and the use of chemical agents or less-lethal munitions] if they did not comply." *Id.* at 1237-38.

The plaintiff in *Cheairs* did not participate in the protest, but "out of curiosity he decided to walk toward the interaction between the protesters and the police after dinner to see and film what was happening at the front." *Id.* at 1238 (simplified). The plaintiff "walked up to a position on a sidewalk at the intersection of 11th and Pine that was abreast of all but a few of the protesters at the front of the crowd." *Id.* "The audio portion of [the plaintiff]'s first iPhone recording captured one of SPD's dispersal orders" and "[a]s [the plaintiff] approached, some protesters were dispersing in the opposite direction." *Id.* "[The plaintiff] . . . stayed on the sidewalk" and "at the time . . . about [fifteen] yards separated the protesters from the police line." *Id.*

"The police ordered the crowd to disperse, and an officer threw several less-lethal munitions toward the crowd[,]" including "a blast ball grenade, a diversionary device that creates a flash of light and emits a loud sound and a chemical irritant two seconds after it is activated." *Id.* at 1235. "The blast ball hit the pavement near the curb where [the plaintiff] was standing,

bounced, and exploded as it struck him in the groin" and "[the plaintiff] was seriously injured." *Id.*

In its analysis of the plaintiff's Fourth Amendment excessive force claim against the officer who threw the blast ball, the Ninth Circuit found that "[t]he comprehensive record disprove[d] [the plaintiff]'s assertion that the crowd was 'largely peaceful'" because "[the plaintiff]'s own videos confirm[ed] that protesters near [the plaintiff] were throwing projectiles, launching fireworks, and shining lasers at officers in the minutes before [the officer] threw the blast ball that struck [the plaintiff]." *Id.* at 1243-44. The court also noted that "the degree of violence [at the protest] appeared to be escalating" and "[t]here [wa]s no question that SPD had given orders to disperse before [the plaintiff] was injured, and . . . [s]ome of the protesters complied, but others ignored the orders[.]" *Id.* at 1244. The court also found that "[t]here is little doubt . . . that a reasonable officer . . . would have concluded, before [the officer] deployed the . . . blast ball grenade that injured [the plaintiff], that probable cause existed to arrest at least some of the protesters for disregarding the dispersal orders, or for assaulting or attempting to assault police officers on the line, at the intersection of 11th and Pine." *Id.*

The Ninth Circuit affirmed the district court's grant of summary judgment for the defendant law enforcement officer and held that, "consider[ing] the totality of the circumstances, . . . the force [the officer] employed was not excessive." *Id.* (citations omitted). Specifically, the court concluded that "it was reasonable for the police to perceive that the protesters at the front of the crowd, near whom [the plaintiff] stood, objectively posed an immediate threat to the safety of officers, citizens, and property." *Id.*

Notably, the Ninth Circuit rejected the plaintiff's argument that the officer's use of force was excessive in light of the Ninth Circuit's analysis in two earlier excessive force cases, *Nelson*

and *Young*. *See id.* at 1245 (first citing *Nelson*, 685 F.3d 867; and then citing *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011)). Specifically, the court found that "[t]he severity of the protesters' crimes . . . and the immediate threat to the safety of the officers, the public, and property easily distinguish the reasonableness of the use of force here from . . . the use of force in *Nelson*" because "[t]he group of college students targeted with pepperballs in *Nelson* was, at most, passively resisting police dispersal orders and not 'engaging in any other threatening or dangerous behavior.'" *Id.* at 1245-46 (quoting *Nelson*, 685 F.3d at 880). The court found that "[t]he facts of *Young* are similarly distinguishable" because "*Young* involved a traffic stop in which an individual declined to get back into his car after exiting to hand his vehicle registration to a police officer . . . [who then] pepper-sprayed [the plaintiff] without warning as he was sitting on the curb and later struck him repeatedly with a baton after he was handcuffed and lying face-down on the ground." *Id.* at 1246 (citing *Young*, 655 F.3d at 1159-60).

### b)    *Puente*

In *Puente*, three separate protestors asserted, *inter alia*, Fourth Amendment excessive force claims based on three different uses of intermediate force at a protest in Phoenix, Arizona. *See Puente*, 123 F.4th at 1057-62.

With respect to the first plaintiff, before the police declared the protest an unlawful assembly, he "was among the members of the crowd shaking the fence" that separated the protestors from the area immediately surrounding a convention center where a political event was taking place. *Id.* at 1057. The officers "fire[d] pepper balls at the ground directly in front of the group, which caused the group to back away" and although the first plaintiff "had initially retreated after the first volley [of pepper balls], [he] resumed shaking the fence within [eleven] seconds of his retreat, and at that point he was struck several times by pepper balls—in the face, lower back, and in three places on the legs." *Id.*

PAGE 16 – OPINION AND ORDER

The defendants did not argue that the first plaintiff "was committing a crime at the time he was struck by the pepper balls, . . . that there was any attempt to actually arrest [him,] or that he resisted any such arrest." *Id.* at 1058. The court, however, explained that although "the risk of physical harm from the physical impact of pepper balls" was "significant[,]" the first plaintiff's "actual injuries, which consisted predominantly of bruising, were not as serious as those in *Nelson*" and "the district court properly characterized the resulting physical force . . . as 'intermediate.'" *Id.* (citations omitted). The court further explained that "[t]he [police department] had a very significant interest in avoiding any breach of the security fence . . . , because that would present an immediate and substantial threat to the safety of the officers [and others]" and the first plaintiff was "on notice of such a potential use of force even without verbal warnings" because the officers had just used force against him. *Id.* The Ninth Circuit concluded that "[e]xamining the totality of the circumstances, . . . as a matter of law, Defendants' use of intermediate force against [the first plaintiff] was a reasonable response that was 'commensurate[ ]' to the [the police department]'s strong interest in avoiding any breach of the fence . . . [and c]onsequently, [the first plaintiff]'s Fourth . . . Amendment rights were not violated." *Id.* at 1058-59 (citations omitted).

With respect to the second plaintiff, after the police declared the protest an unlawful assembly, she "intentionally approached the moving skirmish line in order to 'get a shot of [it]' with her camera . . . even after officers had begun deploying chemical spray at the crowd in her immediate vicinity." *Id.* at 1059. "After taking her photos, [the second plaintiff] turned and began to slowly walk away from the police line, at which point police . . . targeted [her] with a 'muzzle blast'—a burst of chemical powder with irritating properties—as well as pepper spray and an unknown projectile" from a distance of "about ten to [fifteen] feet[.]" *Id.*

The Ninth Circuit acknowledged that the second plaintiff "was not being arrested and was not resisting arrest." *Id.* The court explained that the second plaintiff's injuries, including being "left with a burning sensation in her eyes for roughly fifteen minutes, a temporary cough, and bruising on her backside" were "nowhere near as serious as those in *Nelson*" and classified "the force deployed against her as intermediate." *Id.* The court further explained that the second plaintiff "was [subjected to intermediate force] after she remained in the area in clear disregard of the repeated announcement that an unlawful assembly had been declared and after multiple orders to disperse had been issued[,] . . . chose to place herself directly in front of the advancing skirmish line, and in doing so . . . placed herself between the officers and near the remaining crowd behind her, which was continually throwing objects at the officers." *Id.* The court held that "[the plaintiff's] cho[ice] to place herself in that situation d[id] not diminish the [defendant]'s strong interests in addressing the lawlessness behind her, in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order." *Id.*

The court ultimately concluded that "[v]iewing all of the circumstances in context, the repeated applications of force made by the advancing officers, including the particular [use of intermediate force] that impacted [the second plaintiff], were reasonable measures to accomplish [the defendant]'s substantial interests in public safety." *Id.* at 1059-60 (citing *Forrester*, 25 F.3d at 807-08).[8]

With respect to the third plaintiff, before the police communicated to the protestors that the gathering had been declared an unlawful assembly, the officers fired a projectile into a group

---

[8] As discussed below, the Ninth Circuit further concluded that "even if we were to assume that the Defendant officers violated [the second plaintiff]'s Fourth Amendment rights, they are nevertheless entitled to qualified immunity because the relevant right asserted by [the second plaintiff] was not clearly established." *Puente*, 123 F.4th at 1060.

of protestors that included the third plaintiff, prompting her and others to begin walking "away from the police fence." *Id.* at 1060. While she was walking away, "[s]he was hit by a projectile of some kind in her stomach and upper hip," causing immediate severe pain and "moderately serious injuries[.]" *Id.* at 1060-61.

The Ninth Circuit concluded that "there [wa]s a triable issue as to whether that use of force was objectively unreasonable" because "a number of features surrounding the particular use of force that struck [the third plaintiff] . . . distinguish it from the uses of force against [the first two plaintiffs]." *Id.* at 1061. Specifically, "the video evidence d[id] not show any obviously unlawful or threatening conduct occurring in [the third plaintiff]'s immediate vicinity prior to the relevant Defendants' use of force[,] [n]or did [she] engage in any personal conduct . . . that itself presented a risk to public safety[,] [and she] was also not disobeying any orders [because] at the time, no announcement of an unlawful assembly had been made, and the video evidence indicates that she was confused as to what she was supposed to do." *Id.* The court clarified that "in the absence of the sort of factors we noted with respect to [the first two plaintiffs] . . . , even if [the third plaintiff] *had* 'heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk,' would not make reasonable the particular use of chemical projectiles against her, causing the moderately serious injuries she experienced." *Id.* (quoting *Nelson*, 685 F.3d at 882).[9]

///

///

---

[9] As discussed below, despite finding that genuine issues of material fact existed regarding whether the officers violated the third plaintiff's Fourth Amendment rights, the Court held that the officers were entitled to summary judgment on qualified immunity grounds "[b]ecause no precedent squarely governs the specific facts at issue and because this is not an obvious case[.]" *Puente*, 123 F.4th at 1061 (simplified).

### 3)     Analysis

#### a)     Baton Strike

##### (i)     Type and Amount of Force

With respect to Flohr's first alleged use of force, the parties agree that baton strikes generally constitute intermediate force. (*See* Pl.'s Resp. at 22, "This level of force is classified by courts as 'intermediate' force, . . . and is constitutionally permissible only when justified by a strong governmental interest." (citation omitted); Defs.' Mot. at 20, "The use of baton strikes are considered 'intermediate force.'" (citation omitted).)

The Ninth Circuit has instructed that courts "may also consider the severity of injuries in evaluating the amount of force used" and "may infer from the minor nature of a plaintiff's injuries that the force applied was minimal." *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018) (first citing *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002); and then citing *Jackson v. City of Bremerton*, 268 F.3d 646, 652 (9th Cir. 2001)).

Roe testified that Flohr approached him with her baton raised and attempted to strike him while he was standing still and playing his drum. (*See* Roe Dep. at 67:1-5.) According to Roe, he raised his arm and blocked the relevant baton strike with his forearm. (*See id.* at 68:1-16.) Roe does not present evidence regarding any specific injuries that he suffered relating to Flohr's baton strike. Roe testified that his physical injuries resulting from the August 14, 2020 protest included "bruising[ on his knees,] . . . difficulty walking for maybe a day or two . . . [and] bruis[ing] on [his] back from [a separate] baton" and "[o]ther than that, . . . not anything significant." (*Id.* at 119:20-21.) Roe did not receive nor require any medical treatment for his injuries. (*See id.* at 121:5-22.) In sum, there is no evidence in the summary judgment record that Flohr's first baton strike injured Roe.

///

Viewing the record in the light most favorable to Roe, the Court concludes that Flohr used, at most, intermediate force against Roe. *See Puente*, 123 F.4th at 1059 ("[The plaintiff]'s actual injuries, which consisted predominantly of bruising, were not as serious as those in *Nelson*. Accordingly, the district court properly characterized the resulting physical force used against [the plaintiff] as 'intermediate.'"); *cf. Felarca*, 891 F.3d at 817 ("[H]ere, none of the plaintiffs suffered injuries from defendants' blows that required medical treatment or kept him from returning to the protest. Thus, we conclude that, even if the [baton strikes] used w[ere] of a type that [are] generally intrusive, the amount of force applied here was minimal."); *Sernoffsky v. Novak*, 773 F. Supp. 3d 988, 1021 (S.D. Cal. 2025) ("While [the plaintiff] contends she hit her head on the ground, Plaintiffs do not aver or put forth any evidence that she suffered any injuries or needed medical treatment. Therefore on this record, the Court is highly doubtful that this use of force was anything other than minimal.") (simplified).

### (ii)    Government Interest

With respect to Flohr's alleged baton strike, Defendants argue that "the City had a valid interest in eliminating the 'present danger of riot, disorder, interference with traffic upon the public streets'" and "substantial interests in public safety." (Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply") at 2, ECF No. 104 (first quoting *Cantwell v. State of Connecticut*, 310 U.S. 296, 308 (1940); and then quoting *Puente*, 123 F.4th at 1059).) Roe responds that "the governmental interest in using force against him was at its lowest" because Roe "was a peaceful protester" who was "engaging in expressive conduct protected by the First Amendment" while "standing in a public street, and—at the time Flohr acted—there was no credible basis to treat him as a threat to public safety." (Pl.'s Resp. at 19.)

With respect to the severity of the crime at issue, the only potential crimes were associated with Roe's continued presence in the street following multiple dispersal orders. (*Cf.*

Defs.' Mot. at 25, "Officers Ross and Dyk did not see plaintiff until after he had attacked Officer

Flohr, and . . . Officer Flohr also did not see plaintiff until [their confrontation].") Accepting

Roe's version of events, this factor weighs in favor of finding that Flohr's baton strike was

unreasonable. *See Young*, 655 F.3d at 1164-65 ("[W]hile disobeying a peace officer's order

certainly provides more justification for force . . . , such conduct still constitutes only a non-

violent misdemeanor offense that will tend to justify force in far fewer circumstances than more

serious offenses, such as violent felonies.") (citations omitted).

       With respect to whether Roe posed an immediate threat to the safety of the officers or

others, this factor also weighs in favor of finding that Flohr's baton strike was unreasonable if

the Court accepts Roe's version of events. Specifically, Roe testified that he was standing still

and playing his drum when Flohr approached him with a baton raised and attempted to hit him in

the head. (*See* Roe Dep. at 69:1-5, Roe testified that he was standing still as Flohr approached

him and "appeared to raise [her] baton to strike [him]" and that "it would have hit [him] in the

head.") Defendants assert that "[a]fter officers had passed through the shield wall and were

attempting to clear the area, the video shows plaintiff going *toward* the shield wall." (Defs.'

Reply at 2.) Even if it was clear from the video evidence that Roe was moving toward the

officers (and away from the allegedly deployed tear gas behind him (*see* Roe Dep. at 60:1-3)) at

the time Flohr confronted him, the video does not support that Roe was engaging in any behavior

that posed a threat to the safety of the officers or others beyond the direction he was walking.

(*See generally* Turco Decl. Ex. 2, video of the events leading up to and including portions of Roe

and Flohr's confrontation.) Therefore, the Court finds that this factor weighs in favor of finding

that Flohr's baton strike was unreasonable. *See Young*, 655 F.3d at 1164 ("[A] jury could easily

conclude that [the plaintiff]'s alleged conduct of 'moving' and 'circling'—far from indicating

any objective safety threat to [the officer]—was simply a reasonable response from an individual who was pepper sprayed from behind without warning while sitting on the sidewalk.") (citation omitted).

With respect to whether Roe was resisting or attempting to evade arrest at the time of the baton strike, the Court finds that this factor weighs in favor of finding that Flohr's baton strike was unreasonable. It is undisputed that Roe was not evading, but rather standing still or walking toward the officers, at the time Flohr confronted him. (*See* Defs.' Reply at 2, "After officers had passed through the shield wall and were attempting to clear the area, the video shows plaintiff going *toward* the shield wall.") Further, Roe's failure to comply with Defendants' orders to disperse, without more, does not clearly justify the application of intermediate force. *See Nelson*, 685 F.3d at 882 ("[E]ven if [the plaintiff] heard and was in non-compliance with the officers' orders to disperse, this single act of non-compliance, without any attempt to threaten the officers or place them at risk, would not rise to the level of active resistance. There is therefore no justification for the use of force to be found in the third *Graham* factor.").

Importantly here, courts "must also consider the danger that the overall situation posed to the officers' safety and what effect that has on the reasonableness of the officers' actions" when evaluating additional "specific factors" relevant to the totality of circumstances analysis. *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011). Defendants argue that "[w]hile the event was declared an unlawful assembly, the event qualified as a riot under [Oregon Revised Statute ("ORS") §] 166.015(1)" and "multiple officers testified through declarations to the rocks, beer cans, fireworks, and glass bottles being thrown at officers." (Defs.' Reply at 2.) Roe responds that he "participated in a peaceful protest" and that "officers rushed into the group of protesters 'without warning' and 'knock[ed] people down.'" (Pl.'s Resp. at 8-9.)

PAGE 23 – OPINION AND ORDER

"The record is viewed in the light most favorable to the nonmovants, . . . so long as their version of the facts is not blatantly contradicted by the video evidence." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (simplified). The video evidence in the record confirms that Defendants warned protestors that a failure to disperse could subject them to the use of force and arrest. (*See* Turco Decl. Exs. 2-4, sound truck warnings in the background of the video; Klundt Decl. Ex. 14 at 2, providing a record of the timing and content of each sound truck announcement on the relevant night.)

The video evidence confirms Defendants' account that protestors ignored dispersal orders while forming a wall and throwing objects at the officers before the officers charged at the protestors. (*See* Turco Decl. Ex. 2, video showing the protestors forming a wall and throwing items at the officers; Decl. Joshua Dyk ("Dyk Decl.") Ex. 12 at 1, identifying himself in Ex. 2 video as "the officer pulling Mr. Roe off of Officer Flohr" and that he "kn[ew] this because [he] had paint on [his] helmet[,]" ECF No. 88; *see also id.* ("The crowd blocked traffic by pulling dumpsters in the street. The crowd lit multiple dumpsters on fire. Members of the crowd shined lasers in our eyes. The protesters threw multiple projectiles at us including glass bottles, paint balloons, rocks and other hard objects."); Flohr Decl. Ex. 9 at 4, "[P]eople in the crowd had thrown multiple projectiles including rocks, paint balloons and glass bottles at officers."; Ross Decl. ¶ 4, "The protesters began throwing water bottles, paint balloons, rocks and beer cans at officers as well as shining lasers in officers' eyes."; Decl. Spencer Schaaf ("Schaaf Decl.") Ex. 13 at 1, "I had received information via radio traffic and command updates that demonstrators were blocking the street and were throwing projectiles at officers to include bottles and paint bombs. I personally was witness to two paint bombs and a bottle thrown at a line of officers who were merely standing in place[,]" ECF No. 89; Klundt Decl. Ex. 14 at 2, providing a record of

the relevant sound truck announcements, including: "People in the crowd have thrown paint bombs and other projectiles at officers. All persons must disperse. You are ordered to disperse immediately. Failure to adhere to this order may subject you to arrest, citation, and/or the use of crowd control agents, including, but not limited to tear gas and/or impact weapons.").

The only evidence Roe submits to support his allegation that the protest was peaceful is his own testimony that he did not see any fires or anyone throwing things. (*See* Roe Dep. at 99:9-15.) The video evidence in the record contradicts this testimony, and Roe fails to raise a genuine dispute of fact relating to the dangerousness of the overall situation. (*See* Turco Decl. Ex. 2, video showing the protestors forming a wall and throwing items at the officers); *see also Cheairs*, 145 F.4th at 1243-44 ("The comprehensive record disproves [the plaintiff]'s assertion that the crowd was 'largely peaceful.' Officers' body cams recorded, and [the plaintiff]'s own videos confirm, that protesters near [the plaintiff] were throwing projectiles, launching fireworks, and shining lasers at officers in the minutes before [the officer] threw the blast ball that struck [the plaintiff]."); *Sernoffsky*, 773 F. Supp. 3d at 1013 ("[T]hat one [San Diego Police Department] officer's [body worn camera] footage does not show objects being thrown is not evidence sufficient to draw a reasonable inference that *nothing* was thrown, especially in light of Defendants' evidence that police were 'taking some bottles and eggs' during this confrontation. It also does not undermine the undisputed evidence that individuals in the counter-protester crowd had committed violent acts and had thrown items and objects just prior to reaching the Buffer Zone.").

For these reasons, the Court finds that the "specific factors" relevant to the totality of the circumstances analysis weigh in favor of finding that Flohr's baton strike was a reasonable use of force. *See Cheairs*, 145 F.4th at 1244 ("There is little doubt based upon the video evidence that a

reasonable officer in [the officer]'s shoes would have concluded, before [the officer] deployed the . . . blast ball grenade that injured [the plaintiff], that probable cause existed to arrest at least some of the protesters for disregarding the dispersal orders, or for assaulting or attempting to assault police officers on the line, at the intersection of 11th and Pine. Thus, the government had an important interest in using force to protect officers and bystanders and to prevent serious property damage."); *Puente*, 123 F.4th at 1059 (holding that the defendants' use of intermediate force against a protestor was "objectively reasonable" despite no evidence that the protestor had committed any serious crime, resisted or evaded arrest, or threatened the officers' safety because "[the plaintiff] chose to place herself directly . . . between the officers and near the remaining crowd behind her, which was continually throwing objects at the officers" and the defendants had "strong interests in addressing the lawlessness behind her, in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order").

Consistent with recent Ninth Circuit authority, the Court finds that the City had "strong interests in addressing the lawlessness" in Roe's immediate vicinity, "in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order." *Puente*, 123 F.4th at 1059; *see also Cheairs*, 145 F.4th at 1244 ("There is little doubt based upon the video evidence that a reasonable officer . . . would have concluded, before [the officer] deployed the . . . blast ball grenade that injured [the plaintiff], that probable cause existed to arrest at least some of the protesters for disregarding the dispersal orders, or for assaulting or attempting to assault police officers on the line, at the intersection of 11th and Pine. Thus, the government had an important interest in using force to protect officers and bystanders and to prevent serious property damage.").

///

PAGE 26 – OPINION AND ORDER

### (iii)     Balance

Viewing the evidence in the light most favorable to Roe and balancing the gravity of

Flohr's alleged intrusion on Roe's Fourth Amendment rights and the government's need for that

intrusion, the Court finds that Defendants are entitled to summary judgment on Roe's claim that

Flohr's baton strike constituted excessive force. Consistent with recent Ninth Circuit authority,

Defendants had sufficiently "strong interests in addressing the lawlessness [in Roe's immediate

vicinity], in maintaining the advance of the skirmish line, and in enforcing the unlawful-

assembly order" to justify an intermediate use of force. *Puente*, 123 F.4th at 1059.

Here, like the second plaintiff in *Puente*, although the risk of harm from Flohr's alleged

baton strike was significant, the nature of Roe's actual injuries diminishes the weight of that

factor because they "were nowhere near as serious as those in *Nelson*." *Id.* at 1059. Like the

second plaintiff in *Puente*, Flohr's alleged baton strike came at a time when Roe "was not being

arrested and was not resisting arrest." *Id.* Accepting Roe's version of the facts as true, Roe's

personal conduct, like the second plaintiff in *Puente*, did not necessarily present a risk to the

safety of the officers and others. *See id.* Nevertheless, for the reasons discussed above, Roe does

not genuinely dispute Defendants' evidence that, like the second plaintiff in *Puente*, Roe failed to

disperse after the protest had been declared an unlawful assembly due to the presence of

dangerous conditions. (*See* Roe Dep. at 65:25-66:24, Roe testified that he was "pretty much dead

center in the road" and "standing probably [fifteen] to [twenty-five] feet behind" the protestors'

wall playing his drum leading up to the confrontation with Flohr; Turco Decl. Ex. 2, video with

audible sound truck warning showing protestors forming a wall and throwing projectiles at

officers shortly before the officers charged the protestors); *see also Puente*, 123 F.4th at 1059

("[A] police vehicle arrived . . . and repeatedly communicated further unlawful assembly

announcements. Some individuals remained on Second Street, including [the second plaintiff].").

Like the second plaintiff in *Puente*, that Roe "chose to place h[im]self in that situation does not diminish the [City]'s strong interests in addressing the lawlessness behind h[im], in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order." *Id.*

Further, unlike the third plaintiff in *Puente*, Flohr's alleged baton strike caused minimal, if any, injury to Roe and came in the immediate vicinity of clearly unlawful or threatening conduct after the City declared the protest an unlawful assembly and made multiple dispersal orders. (*See* Turco Decl. Ex. 2, video depicting the nature of the protest leading up to the confrontation between Roe and Flohr; Roe Dep. at 119:117-21, Roe testified that his injuries from the relevant protest included bruising on his knees, back, and difficulty walking for a day or two, and "[o]ther than that . . . not anything significant"); *see also Puente*, 123 F.4th at 1061 ("[T]he video evidence does not show any obviously unlawful or threatening conduct occurring in [the third plaintiff]'s immediate vicinity prior to the relevant Defendants' use of force. . . . [The third plaintiff] was also not disobeying any orders—at the time, no announcement of an unlawful assembly had been made[.]").

For all of these reasons, the Court grants Defendants' motion for summary judgment on Roe's excessive force claim against Flohr based on the alleged baton strike. *See Cheairs*, 145 F.4th at 1244 ("On the record before us, we conclude that it was reasonable for the police to perceive that the protesters at the front of the crowd, near whom [the plaintiff] stood, objectively posed an immediate threat to the safety of officers, citizens, and property. Therefore, having considered the totality of the circumstances, we conclude that the [intermediate] force [the officer] employed was not excessive."); *Puente*, 123 F.4th at 1059-60 ("That [the plaintiff] chose to place herself in that situation does not diminish [the defendant]'s strong interests in addressing the lawlessness behind her, in maintaining the advance of the skirmish line, and in enforcing the

unlawful-assembly order. Viewing all of the circumstances in context, the repeated applications

of force made by the advancing officers, including the particular [use of intermediate force] that

impacted [the plaintiff], were reasonable measures to accomplish the [defendant]'s substantial

interests in public safety." (citing *Forrester*, 25 F.3d at 807-08)); *cf. Felarca*, 891 F.3d at 818

("The [defendant] had a legitimate interest in 'quickly dispersing and removing [the] lawbreakers

with the least risk of injury to police and others.' Similar to *Jackson*, in which we held the

government had a 'safety interest in controlling' a mass of people, the protestors here

'substantially outnumbered' officers, 'refused to obey the officers' commands to disperse,'

'shouted at the officers,' and 'engaged the officers in verbal and physical altercations.' . . . The

protestors also ignored warnings by police and university officials before and during the

protest. . . . Under these circumstances, the government had a legitimate interest in applying

minimal force to maintain order and enforce university policy.") (simplified).[10]

### b)      Take-down Maneuver

#### (i)      Type and Amount of Force

With respect to Flohr's second alleged use of force, the parties agree that take-down

maneuvers generally constitute intermediate force. (*See* Pl.'s Resp. at 22, "This level of force is

classified by courts as 'intermediate' force, . . . and is constitutionally permissible only when

justified by a strong governmental interest." (citation omitted); Defs.' Mot. at 20, "A 'take-

down' maneuver is considered intermediate force.")

Roe fails to identify which, if any, of his injuries resulted from Flohr's take-down

maneuver. Roe testified that his injuries included bruising on both of his knees, "difficulty

---

[10] For the reasons explained below, the Court also finds that the officers are entitled to
qualified immunity on Roe's excessive force claims.

walking for maybe a day or two[,] . . . bruising on [his] back from [a] baton[,] [and] [other than

that, . . . not anything significant." (Roe Dep. at 119:17-21.) Roe did not receive nor require any

medical treatment for his injuries. (*See id.* at 121:5-22.)

For the reasons explained above relating to Flohr's baton strike, the Court concludes that

the force used against Roe was, at most, intermediate force. *See Puente*, 123 F.4th at 1059 ("[The

plaintiff]'s actual injuries, which consisted predominantly of bruising, were not as serious as

those in *Nelson*. Accordingly, the district court properly characterized the resulting physical

force used against [the plaintiff] as 'intermediate.'"); *cf. Felarca*, 891 F.3d at 817 ("[H]ere, none

of the plaintiffs suffered injuries from defendants' blows that required medical treatment or kept

him from returning to the protest. Thus, we conclude that, even if the [baton strikes] used w[ere]

of a type that [are] generally intrusive, the amount of force applied here was minimal.");

*Sernoffsky*, 773 F. Supp. 3d at 1021 ("While [the plaintiff] contends she hit her head on the

ground, Plaintiffs do not aver or put forth any evidence that she suffered any injuries or needed

medical treatment. Therefore on this record, the Court is highly doubtful that this use of force

was anything other than minimal.") (simplified).

### (ii)    Government Interest

With respect to the take-down maneuver, Defendants argue that "[t]he government has a

very high interest in subduing an individual who had been mounted on top of Officer Flohr and

was actively resisting arrest." (Defs.' Reply at 3, citing *Chew v. Gates*, 27 F.3d 1432, 1441 (9th

Cir. 1994).) Roe responds that each of the *Graham* factors weighs in favor of finding that Flohr's

use of force was unreasonable. (*See* Pl.'s Resp. at 18-23.)

With respect to the severity of the crime at issue, Roe argues that "there was—at most—a

basis to suspect a minor violation" at the time Flohr (and others) tackled Roe. (*Id.* at 18.)

Defendants argue that "[Roe]'s behavior on video shows him resisting and fighting with the

officers" and that his characterization of the events is "'blatantly contradicted' by the video."
(Defs.' Reply at 3.)

Roe testified that Flohr approached him with her baton raised and attempted to strike him while he was standing still and playing his drum. (*See* Roe Dep. at 67:1-5.) According to Roe, he raised his arm to block Flohr's baton strike, at which point Flohr grabbed Roe's shirt and tripped, pulling him down on top of her. (*See id.* at 69:13-70:9.) At that point, Roe "tried to . . . get up off of [Flohr] . . . , but that's when [he] was tackled by other officers." (*Id.* at 80:25-81:2.) According to Roe, during the ensuing struggle, he tried to defend himself, but did not hit any of the officers. (*See id.* at 80:6-17.) Roe then grabbed one of the officers' batons and attempted to use it to stand up and regain his footing. (*See id.* at 83:22-84:6.) After regaining his footing for "a second or two" (*id.* at 84:6), Flohr and others carried out the take-down maneuver and restrained Roe on the ground. (*See id.* at 85:18-22; *see also* Turco Decl. Ex. 4, video reflecting that the officers restrained Roe after the relevant take-down maneuver.)

Defendants argue that the severity of the crime factor weighs in favor of finding that Flohr's take-down maneuver was reasonable because Roe "was arrested for Disorderly Conduct (ORS 166.025), Resisting Arrest (ORS 162.315), Interfering with a Police Officer (ORS 162.247), and Assaulting a Public Safety Officer (ORS 163.208) . . . [which] were directly related to plaintiff attacking Officer Flohr and then resisting arrest following his attack." (Defs.' Mot. at 21.) Defendants acknowledge that those state charges were dismissed (*see id.*), although a federal grand jury later indicted Roe on one count of civil disorder. (*See* Roe Dep. at 224:4-6.)

Construing the evidence in the light most favorable to Roe, the Court finds that the severity of the crimes at issue weighs in favor of finding that Flohr's take-down maneuver was unreasonable. Whether the crime at issue was serious depends on whether Roe assaulted Flohr,

which is a disputed fact. *See Janfaza v. City of Glendale*, No. 2:23-cv-01312, 2024 WL 6085278, at *10 (C.D. Cal. Sept. 30, 2024) ("[R]esisting, delaying or obstructing a police officer is generally characterized as a non-serious offense.") (citations omitted). The video evidence did not capture the initial confrontation between Roe and Flohr and both Roe and Flohr present evidence supporting that the other party was the initial aggressor in the confrontation. (*See, e.g.*, Roe Dep. at 67:1-5, "I . . . was approached by an officer. That officer appeared to raise their baton to strike me. I lifted my hand, and then that officer grabbed my person and pulled me down."; Flohr Decl. Ex. 1 at 1, "When I contacted [Roe], it was because he had initiated a fight with me by running toward me and punching me in the head.") In light of material disputed facts, the Court finds that reasonable jurors could disagree about whether Roe's conduct posed a threat to the safety of the officers. *See Mattos*, 661 F.3d at 445 (finding that the plaintiff who "refused to get out of her car when requested to do so and later stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car . . . did not involve any violent actions towards the officers . . . [but] engaged in some resistance to arrest").

Thus, crediting Roe's version of the facts, as the Court must at this stage, a reasonable juror could conclude that the crime at issue related only to Roe's presence at the protest, failure to disperse, and non-violent resistance to arrest. Accordingly, the Court finds that this factor weighs in favor of finding that Flohr's take-down maneuver was unreasonable. *See Young*, 655 F.3d at 1164-65 ("[W]hile disobeying a peace officer's order certainly provides more justification for force . . . , such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies.") (citations omitted).

///

With respect to whether Roe posed an immediate threat to the safety of the officers or others, this factor also weighs in favor of finding that Flohr's take-down maneuver was unreasonable. Specifically, Defendants argue that Flohr "used force to subdue [Roe]" because "he was mounted on top of her" and attacking her. (Defs.' Reply at 3.) Roe responds that "[t]he only 'threat' arose from Officer Flohr's own escalation—charging at a peaceful protester with a raised baton and initiating physical contact" and that "Roe's movements appear defensive or reactive at most—there is no footage showing him throwing punches or trying to injure any officer." (Pl.'s Resp. at 20.)

Although the parties dispute how and why Flohr pulled Roe to the ground, Defendants do not dispute that Flohr pulled Roe down on top of her. (*See* Burgess Decl. Ex. 3 at 19:9-12, "I used my hold on his gas mask to try to take him to the ground, and then I could feel him still hitting me on the ground. He ended up on top of me[.]") The videos in the record begin capturing the confrontation between Flohr and Roe when Roe is on top of Flohr. (*See* Turco Decl. Ex. 2 at 0:17.) Roe appears grab Flohr while he is on top of her but the video does not clearly show that he is attempting to strike, punch, or attack her. (*See id.*) One second later, another officer grabs Roe and pulls him off Flohr. (*See id.* at 0:18.) The video depicts that Roe struggled with the officers and grabbed an officer's baton as he stood up. Although he appears to maintain his hold on the baton as another officer attempts to pull it away, the officers ultimately brought Roe back to the ground and restrained him. (*See generally* Turco Decl. Ex. 4, video of Roe struggling with officers and grabbing one of the officers' batons before being tackled and restrained.)

The Court finds that reasonable jurors could disagree on whether Roe's conduct posed a threat to the officers' safety. *See Vos*, 892 F.3d at 1028 ("The record is viewed in the light most favorable to the nonmovants . . . so long as their version of the facts is not blatantly contradicted

by the video evidence[.] The mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage.") (simplified). Specifically, crediting Roe's version of the facts, as the Court must at this stage, a reasonable juror could conclude that Roe was not posing a threat to the officers. *See Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1148 (E.D. Cal. 2016) ("[The arrestee] was sitting or lying on the ground, and noncompliant with [the officer]'s commands in that he did not move how or where [the officer] wanted him. Otherwise, according to Plaintiffs, [the arrestee] was nonviolent, not fleeing, did not assault any officer, and his physical resistance, if any, was a brief response to pain stimulus. Crediting Plaintiffs' version of events, a reasonable jury could find that, as in *Young*, [the arrestee]'s alleged conduct did not amount to an immediate threat."). Thus, the immediate threat to the safety of the officers factor weighs in favor of finding at this stage that Flohr's take-down maneuver was unreasonable.

With respect to whether Roe was resisting or attempting to evade arrest, the Court finds that this factor also weighs in favor of finding that Flohr's take-down maneuver was unreasonable. It is undisputed that Roe "tried to get away in any way that he could" from the officers. (Roe Dep. at 67:15-16). It is unclear, however, whether any of the officers ever gave Roe any orders or told him he was under arrest before or during the relevant confrontation. (*See id.* at 82:9-11, "[T]he female officer asked if they were arresting me, and then a male officer respond[ed], no, we'll beat him right there."; *id.* at 87:6-16, Roe testified that based on the officers' comments, he thought "they were trying to beat [him] up" and that he did not know he was under arrest.) Thus, the Court finds this factor weighs in favor of finding that Flohr's take-down maneuver was unreasonable. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 479-80 (9th Cir. 2007) ("[T]he arresting officers gave no warning that they were going to arrest him

before gang-tackling him and later applying hobble restraints. Indeed, as the video shows, [the officer] did not even attempt to handcuff [the plaintiff] before [the officers] . . . simultaneously took hold of and wrestled him to the ground. The lack of forewarning, the swiftness, and the violence with which the defendant officers threw themselves upon [the plaintiff] could reasonably be considered 'provocative,' triggering [the plaintiff]'s limited right to reasonable resistance and thus making their later use of the hobble restraints unreasonable.").

For the reasons described above, however, the Court finds that the additional "specific factors" relevant to the totality of the circumstances analysis, including that Defendants issued warnings before using force and the dangerousness of the overall situation, weigh in favor of finding that Flohr's takedown maneuver was a reasonable use of force. *See Cheairs*, 145 F.4th at 1244 ("There is little doubt based upon the video evidence that a reasonable officer in [the officer]'s shoes would have concluded, before [the officer] deployed the . . . blast ball grenade that injured [the plaintiff], that probable cause existed to arrest at least some of the protesters for disregarding the dispersal orders, or for assaulting or attempting to assault police officers on the line, at the intersection of 11th and Pine. Thus, the government had an important interest in using force to protect officers and bystanders and to prevent serious property damage."); *Puente*, 123 F.4th at 1059 (holding that the defendants' use of intermediate force against a protestor was "objectively reasonable" despite no evidence that the protestor had committed any serious crime, resisted or evaded arrest, or threatened the officers' safety because "[the plaintiff] chose to place herself directly . . . between the officers and near the remaining crowd behind her, which was continually throwing objects at the officers" and the defendants had "strong interests in addressing the lawlessness behind her, in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order").

Weighing all of these factors consistent with recent Ninth Circuit authority, the Court finds that the City had "strong interests in addressing the lawlessness" in Roe's immediate vicinity, "in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order." *Puente*, 123 F.4th at 1059; *see also Cheairs*, 145 F.4th at 1244 ("There is little doubt based upon the video evidence that a reasonable officer . . . would have concluded, before [the officer] deployed the . . . blast ball grenade that injured [the plaintiff], that probable cause existed to arrest at least some of the protesters for disregarding the dispersal orders, or for assaulting or attempting to assault police officers on the line, at the intersection of 11th and Pine. Thus, the government had an important interest in using force to protect officers and bystanders and to prevent serious property damage.").

### (i)    Balance

Viewing the evidence in the light most favorable to Roe and balancing the gravity of Flohr's alleged intrusion on Roe's Fourth Amendment rights and the government's need for that intrusion, the Court finds that Defendants are entitled to summary judgment on Roe's claim that Flohr's take-down maneuver constituted excessive force. Specifically, recent Ninth Circuit authority requires the Court to find that Defendants had sufficiently "strong interests in addressing the lawlessness [in Roe's immediate vicinity], in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order" to justify the use of immediate force. *Puente*, 123 F.4th at 1059.

Accordingly, the Court grants Defendants' motion for summary judgment relating to Roe's excessive force claim against Flohr based on the take-down maneuver. *See Cheairs*, 145 F.4th at 1244 ("On the record before us, we conclude that it was reasonable for the police to perceive that the protesters at the front of the crowd, near whom [the plaintiff] stood, objectively posed an immediate threat to the safety of officers, citizens, and property. Therefore, having

considered the totality of the circumstances, we conclude that the [intermediate] force [the officer] employed was not excessive."); *Puente*, 123 F.4th at 1059 ("That [the plaintiff] chose to place herself in that situation does not diminish [the defendant]'s strong interests in addressing the lawlessness behind her, in maintaining the advance of the skirmish line, and in enforcing the unlawful-assembly order. Viewing all of the circumstances in context, the repeated applications of force made by the advancing officers, including the particular [use of intermediate force] that impacted [the plaintiff], were reasonable measures to accomplish the [defendant]'s substantial interests in public safety." (citing *Forrester*, 25 F.3d at 807-08)); *cf. Felarca*, 891 F.3d at 818 ("The [defendant] had a legitimate interest in 'quickly dispersing and removing [the] lawbreakers with the least risk of injury to police and others.' Similar to *Jackson*, in which we held the government had a 'safety interest in controlling' a mass of people, the protestors here 'substantially outnumbered' officers, 'refused to obey the officers' commands to disperse,' 'shouted at the officers,' and 'engaged the officers in verbal and physical altercations.' . . . The protestors also ignored warnings by police and university officials before and during the protest. . . . Under these circumstances, the government had a legitimate interest in applying minimal force to maintain order and enforce university policy.") (simplified).

### b.    Qualified Immunity

Defendants move for summary judgment on Roe's claims against the individual officers on the ground that "the officers . . . [are] entitled to qualified immunity because there was no clearly established law at the time by which the officers would have known they were violating plaintiff's rights." (Defs.' Mot. at 26.) Roe responds that "[n]o reasonable officer could believe that it was lawful to attack a non-violent, non-resisting protestor with a baton[.]" (Pl.'s Resp. at 29.)

///

PAGE 37 – OPINION AND ORDER

### 1)    Applicable Law

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hampton v. California*, 83 F.4th 754, 765 (9th Cir. 2023) (simplified). The existing precedent at the time of the conduct must have placed the constitutional question "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case," *id.* (citation omitted), and must give "fair warning." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Regardless, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741.

The Supreme Court has repeatedly warned courts not to define clearly established law "at a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted). "[T]he farther afield existing precedent lies from the case under review, the more likely it will be that the officials' acts will fall within that vast zone of conduct that is perhaps regrettable but is at least arguably constitutional." *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016). If the conduct falls within this permissible zone, qualified immunity applies. *See id.* Whether there exists a clearly established right applicable to the conduct at issue is "a question of law" for the Court to decide. *Morales v. Fry*, 873 F.3d 817, 819 (9th Cir. 2017).

### 2)    Recent Ninth Circuit Authority

In *Puente*, the Ninth Circuit held that the Phoenix Police Department officers were entitled to qualified immunity with respect to similar claims relating to the use of intermediate force against protestors. *See Puente*, 123 F.4th at 1060-62. The court held that the second and third plaintiffs in *Puente* failed to "cite any case that could have clearly established that

Defendants' use of force . . . was objectively unreasonable" because the facts in *Nelson* are "'materially distinguishable' and thus d[id] not clearly establish the law governing this case." *Id.* at 1060 (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021)); *see also id.* at 1061 ("[W]e conclude that *Nelson* is 'materially distinguishable' in several respects and that it therefore did not 'clearly establish' that the relevant Defendants' actions violated [the third plaintiff]'s rights."). The Ninth Circuit further held that the officers' use of force in *Puente* were "plainly not an 'obvious' case in which every reasonable officer would have recognized that the Defendant officers' conduct was unlawful." *Id.* at 1060; *see also id.* at 1061 ("Because no precedent 'squarely governs' the specific facts at issue' and because this is not an 'obvious case,' we conclude that the relevant Defendants are entitled to qualified immunity with respect to the force used against [the third plaintiff].") (simplified).

### 3)    Analysis

Defendants move for summary judgment on Roe's Fourth Amendment excessive force claims on the ground that the officers are entitled to qualified immunity. (*See* Defs.' Mot. at 26-28.) Specifically, Defendants argue that "[u]nder *Puente*, these facts show that plaintiff's constitutional rights were not violated, and there was no clearly established law at the time to indicate otherwise." (Defs.' Reply at 8, citing *Puente*, 123 F.4th 1035.) Roe responds that "by August 2020, it was unequivocally established that officers may not use significant or intermediate force—such as baton strikes, takedowns, or projectile weapons—on individuals who are not posing an immediate threat, are not fleeing, and are engaged in passive or verbal protest." (Pl.'s Resp. at 32-33.)

Roe relies on many of the same cases that the Ninth Circuit in *Puente* rejected when it held that officers in similar circumstances were entitled to qualified immunity. (*Compare* Pl.'s Resp. at 30-33, arguing that the officers are not entitled to qualified immunity for Roe's

excessive force claims, citing, *inter alia*, Nelson, *Headwaters Forest Def. v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002), *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), and *LaLonde v. County of Riverside*, 204 F.3d 947 (9th Cir. 2000) *with* Pls.' Answer. Br., *Puente v. City of Phoenix*, No. 22-15661, 2022 WL 18024021, at *20 (9th Cir. Dec. 23, 2022), first citing *Nelson*, 685 F.3d at 886; then citing *Headwaters Forest Def.*, 276 F.3d at 1130-31; then citing *Deorle*, 272 F.3d at 1285; and then citing *LaLonde*, 204 F.3d at 960-61).

Specifically, when addressing the "clearly established" prong of the qualified immunity analysis relating to the second plaintiff's claims in similar protest-related circumstances, the Ninth Circuit found that "[t]he closest case is *Nelson*," and distinguished the facts in *Nelson* from the protest at issue in *Puente* on the ground that "there was no objective indication of any 'threatening or dangerous behavior'" in *Nelson*. *Puente*, 123 F.4th at 1060 (quoting *Nelson*, 685 F.3d at 880-81); *see also Cheairs*, 145 F.4th at 1245-46 ("[T]he large crowd of protesters at 11th and Pine had ignored multiple dispersal orders that included directions to exit, and the crowd was growing increasingly violent. The severity of the protesters' crimes in this case and the immediate threat to the safety of the officers, the public, and property easily distinguish the reasonableness of the use of force here from the reasonableness of the use of force in *Nelson*. The facts of *Young* are similarly distinguishable.") (simplified).

Further, when addressing the "clearly established" prong of the qualified immunity analysis relating to the third plaintiff's claims, the Ninth Circuit distinguished the facts in *Nelson* from the protest at issue in *Puente* on similar grounds. *See Puente*, 123 F.4th at 1061 ("First, *Nelson* emphasized the overall 'absence of exigency involved' in the officers' dispersal of the gathering at issue in that case. . . . Thus, *Nelson* did not involve the larger exigent public safety concerns that are present in the overall context of this case. Second, we emphasized in *Nelson*

that Nelson was part of a group of 'students gathered with [him] in the breezeway' of the apartment, which was a separate and 'very narrow and confined space,' and that several of the 'defendant officers stated in their depositions that they did not see anyone in Nelson's group throwing bottles or engaging in any other threatening or dangerous behavior.' Although there was no apparent misconduct in [the third plaintiff]'s *immediate* area at the time that she was struck, she was not in a discretely separate zone from those down the block . . . who were still engaged in such acts. . . . Third, . . . there had been (unlike *Nelson*) numerous objective indicia that the police were trying to clear the area.") (simplified).

Similarly here, the cases on which Roe relies do not establish that any reasonable officer present in these circumstances (i.e., a protest that had been declared an unlawful assembly due to the presence of dangerous conditions) would have recognized that the baton strike or take-down maneuver were unlawful. In fact, most of the cases Roe cites did not relate to nor address police use of force in the context of a protest. *See, e.g.*, *Young*, 655 F.3d at 1158 (analyzing police use of force during a traffic stop); *Winterrowd v. Nelson*, 480 F.3d 1181, 1182 (9th Cir. 2007) (same); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1089 (9th Cir. 2013) (analyzing police use of force against an individual in the midst of a mental health crisis); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003) (same); *Deorle*, 272 F.3d at 1276 (same); *LaLonde*, 204 F.3d at 950 (analyzing police use of force while investigating a residential noise complaint).

Further, *Nelson* is distinguishable for the reasons the Ninth Circuit discussed in *Cheairs* and *Puente*. *See Cheairs*, 145 F.4th at 1245-46 ("[T]he large crowd of protesters at 11th and Pine had ignored multiple dispersal orders that included directions to exit, and the crowd was growing increasingly violent. The severity of the protesters' crimes in this case and the immediate threat

to the safety of the officers, the public, and property easily distinguish the reasonableness of the use of force here from the reasonableness of the use of force in *Nelson*.") (simplified); *Puente, 123 F.4th at 1060* ("[T]he defendants in *Nelson* deployed force against a group of college partiers at an apartment complex who had already been effectively confined by police and were peacefully awaiting instructions on how and when they could leave. Furthermore, there was no objective indication of any 'threatening or dangerous behavior.' These differences, among others, make clear that *Nelson* 'is materially distinguishable' and thus does not clearly establish the law governing this case.") (simplified); *id.* at 1061 (further distinguishing *Nelson* on the additional grounds that "[the third plaintiff] was not in a discretely separate zone from those down the block . . . who were still engaged in [dangerous] acts. . . . [and] there had been (unlike *Nelson*) numerous objective indicia that the police were trying to clear the area").

Headwaters Forest Defense* is distinguishable for the same reasons. *See Headwaters Forest Def.*, 276 F.3d at 1130 ("[T]he protestors were sitting peacefully, were easily moved by the police, and did not threaten or harm the officers. . . . *Because the officers had control over the protestors* it would have been clear to any reasonable officer that it was unnecessary to use pepper spray to bring them under control, and even less necessary to repeatedly use pepper spray against the protestors when they refused to release from the 'black bears.'") (emphasis added).

Here, like the plaintiffs in *Puente*, Roe cites no cases clearly establishing that the lawfulness of the officers' uses of force in these circumstances is "beyond debate." *White*, 580 U.S. at 79 (citation omitted). Consistent with the Ninth Circuit's holding in *Puente*, the Court grants Defendants' motion for summary judgment on Roe's excessive force claims on the ground that the individual defendants are entitled to qualified immunity. *See Puente*, 123 F.4th at 1060 ("[T]here was no objective indication of any 'threatening or dangerous behavior.' These

differences, among others, make clear that *Nelson* 'is materially distinguishable' and thus does not clearly establish the law governing this case. And this is plainly not an 'obvious' case in which every reasonable officer would have recognized that the Defendant officers' conduct was unlawful.") (citations omitted); *id.* at 1061 (further distinguishing *Nelson* on the additional grounds that "[the third plaintiff] was not in a discretely separate zone from those down the block . . . who were still engaged in [dangerous] acts. . . . [and] there had been (unlike *Nelson*) numerous objective indicia that the police were trying to clear the area"); *cf. Cheairs*, 145 F.4th at 1245-46 ("[T]he large crowd of protesters at 11th and Pine had ignored multiple dispersal orders that included directions to exit, and the crowd was growing increasingly violent. The severity of the protesters' crimes in this case and the immediate threat to the safety of the officers, the public, and property easily distinguish the reasonableness of the use of force here from the reasonableness of the use of force in *Nelson*. The facts of *Young* are similarly distinguishable.") (simplified); *Felarca*, 891 F.3d at 818 ("When *Young* and *Headwaters* are viewed together, two important distinctions emerge. First, unlike the plaintiffs in *Young* and *Headwaters* who restricted their *own* movement by refusing to comply with police orders, the protestors here purposefully restricted the *officers'* movement by refusing to let them pass. Second, the situation confronting the officers here was far more threatening because they were greatly outnumbered [by protestors] and verbally and physically provoked. While we are careful not to attribute other protestors' actions to those plaintiffs who do not admit physically provoking police, 'the context of the officers' actions must be considered.'") (citations omitted).

### c.    City of Portland

Defendants move for summary judgment on Roe's excessive force claim against the City on the grounds that "plaintiff was not deprived of a constitutional right" and "there is no evidence to support [Roe's *Monell*] theories." (Defs.' Mot. at 28.) Roe responds by asserting

three theories of *Monell* liability based on Flohr's alleged use of excessive force. First, Roe argues that the City is liable for the alleged constitutional violation because "[t]h[e] overwhelming volume of complaints, footage, lawsuits, settlements, and unaddressed misconduct establishes a de facto policy, custom, or practice of excessive force adopted and implemented by the [officers] with the City's knowledge and acquiescence." (Pl.'s Resp. at 42.) Second, Roe argues that "[t]he evidence shows that Portland's training culture fostered, rather than prevented, excessive force" that "directly contributed to the unconstitutional conduct alleged here." (*Id.* at 44.) Third, Roe argues that "[t]he City's inaction in the face of repeated misconduct was not passive neglect—it was a conscious choice not to intervene." (*Id.* at 49.)

### 1)    Applicable Law

"*Monell* established that municipalities can be liable for infringement of constitutional rights, under certain circumstances." *Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690-95 (1978)). "[M]unicipalities may be liable under [Section] 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Id.* at 602-03. "To establish *Monell* liability, Plaintiffs must allege that: (1) they were deprived of a constitutional right; (2) the municipality had a policy, custom, or practice; (3) the policy, custom, or practice amounted to deliberate indifference of the plaintiffs' constitutional rights; and (4) the policy, custom, or practice was the 'moving force' behind the constitutional violation." *Cantu v. City of Portland*, No. 3:19-cv-01606-SB, 2020 WL 2952972, at *3 (D. Or. June 3, 2020) (citing *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty.*

PAGE 44 – OPINION AND ORDER

*v. Brown*, 520 U.S. 397, 404 (1997). If no constitutional violation occurred, a municipal liability

claim necessarily fails. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that

a *Monell* claim cannot survive without an underlying constitutional violation).

### 2)    Analysis

The threshold question in determining whether Roe can establish *Monell* liability here is

whether a constitutional violation occurred. As discussed above, recent Ninth Circuit authority

requires a conclusion that the officers' uses of force were reasonable as a matter of law and thus

did not violate Roe's Fourth Amendment rights. Roe's *Monell* claims fail as a matter of law

because no constitutional violation occurred.[11] *See id.* (holding that a *Monell* claim cannot

survive without an underlying constitutional violation); *see also Lockett v. County of Los*

*Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) ("*Monell* claims thus require a plaintiff to show an

underlying constitutional violation."); *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 907 (9th

Cir. 2007) ("If no constitutional violation occurred, the municipality cannot be held liable[.]"

(citing *Heller*, 475 U.S. at 799)); *Dickerson v. City of Portland*, No. 3:19-cv-01126-SB, 2020

WL 7391267, at *6 (D. Or. Dec. 16, 2020) (holding that because the "officers did not violate the

Fourth Amendment when they arrested [the plaintiff,] . . . no constitutional violation occurred,

[and the plaintiff's] *Monell* claim fails as a matter of law" (citing *Heller*, 475 U.S. at 799)), *aff'd*,

No. 20-36121, 2022 WL 824588 (9th Cir. Mar. 18, 2022).

### 2.    False Arrest

Defendants move for summary judgment on Roe's false arrest claims on two grounds.

First, Defendants move for summary judgment on the ground that "[t]he police report, videos,

---

[11] Accordingly, the Court denies as moot Defendants' requests to strike certain evidence Roe submitted in support of his *Monell* claim. (*See* Defs.' Reply at 9-13.)

and federal indictment all point to probable cause existing . . . [and] [a]s such, the claim of false

arrest . . . fails and should be dismissed." (Defs.' Mot. at 24.) Second, Defendants move for

summary judgment on the ground that the officers are entitled to qualified immunity. (*See id.* at

26-27.)

Roe responds that the Court should deny Defendants' motion because "[a] jury could

reasonably find that Roe was a peaceful protester who was tackled without cause and falsely

accused to cover up that use of force." (Pl.'s Resp. at 29.) In reply, Defendants argue that

"[Roe]'s [response] addresses the crime of Assault on a Public Safety Officer only and does not

address the elements of the other crimes at issue." (Defs.' Reply at 4.) Specifically, "[i]n addition

to Assaulting a Public Safety Officer (ORS 163.208), plaintiff was also arrested for Disorderly

Conduct (ORS 166.025), Resisting Arrest (ORS 162.315), and Interfering with a Police Officer

(ORS 162.247)." (*Id.*, citing Flohr Decl. Ex. 9 at 3.) Defendants further argue that Roe's

"actions—before the incident with Officer Flohr occurred—are sufficient for probable cause to

arrest for Disorderly Conduct or [Interfering with a Police Officer]." (*Id.* at 5.)

### a.    Applicable Law

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United

States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692,

700 (1981)). Probable cause to arrest exists "when officers have knowledge or reasonably

trustworthy information sufficient to lead a person of reasonable caution to believe that an

offense has been or is being committed by the person being arrested." *Id.* (citing *Beck v. Ohio*,

379 U.S. 89, 91 (1964)). Put differently, probable cause exists when "under the totality of

circumstances known to the arresting officers, a prudent person would have concluded that there

was a fair probability that the defendant had committed a crime." *Id.* (simplified); *see also Hill v.

City of Fountain Valley*, 70 F.4th 507, 515 (9th Cir. 2023) (so stating).

Claims for false arrest focus on the validity of the arrest, not on the validity of each individual charge. *See Barry v. Fowler*, 902 F.2d 770, 773 n.5 (9th Cir. 1990) (noting that because the defendant officer had probable cause to arrest the plaintiff for one charge, the arrest was not unconstitutional even if the officer lacked probable cause for another charge); *see also Lacy v. County of Maricopa*, 631 F. Supp. 2d 1183, 1194 (D. Ariz. 2008) (collecting cases). The existence of probable cause is a complete defense to a claim for wrongful arrest. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1988) ("To prevail on his [Section] 1983 claim for false arrest . . . [the plaintiff] would have to demonstrate that there was no probable cause to arrest him."); *Hutchinson v. Grant*, 796 F.2d 288, 290 (9th Cir. 1986) (concluding that "[a] police officer has immunity if he arrests with probable cause"). "[T]he issue is not whether [the plaintiff] was convicted, but whether probable cause supported his arrest in the first instance." *Carr v. City of Hillsboro*, 497 F. Supp. 2d 1197, 1213 (D. Or. 2007).

"Generally, 'the existence of probable cause is a question for the jury,' though summary judgment is appropriate when there is no genuine issue of fact and if 'no reasonable jury could find an absence of probable cause under the facts.'" *Johnson v. Barr*, 73 F.4th 644, 651 (9th Cir. 2023) (quoting *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994)), *as amended*, 79 F.4th 996 (9th Cir. 2023).

### b.    Analysis

Defendants argue that Roe's actions "constitute probable cause for all four crimes for which he was arrested, but . . . for sake of brevity address only the lesser of the four," disorderly conduct, "as probable cause is only needed on one of the crimes for the arrest to have been lawful." (Defs.' Reply at 5 n.3.) The undisputed evidence in the record supports that disorderly conduct was one of the charges for which Flohr arrested Roe. (*See* Flohr Decl. Ex. 9 at 3.)

Under ORS § 166.025, "A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person: . . . [m]akes unreasonable noise . . . [or] [o]bstructs vehicular or pedestrian traffic on a public way[.]" OR. REV. STAT. § 166.025.

Roe testified that he was "standing probably [fifteen] to [twenty-five] feet behind" the protestors' wall at the time the officers "r[a]n and charge[d] at the line of protestors." (Turco Decl. Ex. 7 at 14:7-14; *see also id.* at 17:3-5, Roe testified that he was standing totally still as the officers approached him.) Roe testified that he did not hear the warnings from the sound truck at any point that evening. (*See id.* at 21:21-23.) The undisputed evidence in the record supports that the PPB sound truck made multiple announcements leading up to the confrontation, declaring the protest an unlawful assembly and ordering that "[a]ll persons must disperse." (Klundt Decl. Ex. 14 at 2, providing a record of the timing and content of each sound truck announcement on the relevant night; *see also* Turco Decl. Ex. 2, video of the confrontation where sound truck announcements ordering protestors to disperse can be heard leading up to the confrontation.)

Considering the totality of the circumstances and construing the facts in the light most favorable to Roe, the Court finds that no reasonable juror could conclude that Flohr lacked probable cause to arrest Roe for disorderly conduct. The evidence in the record supports that the PPB sound truck made multiple announcements declaring the protest an unlawful assembly and ordering protestors to disperse. (*See* Klundt Decl. Ex. 14 at 2, providing a record of the timing and content of each sound truck announcement on the relevant night; *see also* Turco Decl. Ex. 2, video of the confrontation where sound truck announcements ordering protestors to disperse can be heard leading up to the confrontation.) Roe does not dispute that he was in the street playing a drum at the time Defendants ordered the protestors to disperse. (*See* Roe Dep. at 69:3-5, Roe

testified that he was standing still when Flohr approached him; *see also id.* at 65:25, "I was pretty much dead center in the road."; *cf.* Pl.'s Resp. at 18, "At the time Officer Flohr initiated force against Roe, there was—at most—a basis to suspect a minor violation. The protest had been declared an 'unlawful assembly,' a non-violent offense under Oregon law that typically results in a citation or low-level misdemeanor charge for failing to disperse." (citing OR. REV. STAT. § 166.025).) Nor does Roe dispute that he did not disperse. (*See id.*, "According to Roe's testimony and the video evidence, he was standing in the street, unarmed, and playing a drum when Officer Flohr charged at him unprovoked and without justification."; *id.* at 22, "At most, Roe's conduct may be characterized as 'passive resistance'—remaining in place and failing to disperse.")

Whether or not Roe's earplugs prevented him from hearing multiple orders to disperse is "immaterial because probable cause and qualified immunity turn on 'the totality of the circumstances *known to the officer at the time of the arrest*[.]'" *Mendoza v. City of Portland by & through Portland Police Bureau*, No. 3:21-cv-01503-JR, 2023 WL 6384952, at *8 (D. Or. July 21, 2023) (quoting *Hicks v. City of Portland*, No. 3:04-cv-00825-AS, 2006 WL 3311552, at *6-12 (D. Or. Nov. 8, 2006))), *findings and recommendation adopted*, 2023 WL 6384897 (D. Or. Sept. 28, 2023).

For these reasons, the Court grants Defendants' motion for summary judgment on Roe's false arrest claim because no reasonable juror could conclude that Flohr lacked probable cause to arrest Roe.[12] *See Raiford v. City of Portland*, 321 Or. App. 349, 351-53 (2022) (unpublished)

---

[12] Whether or not the officers had probable cause to arrest Roe, the Court also finds that the individual defendants are entitled to qualified immunity because "it is *reasonably arguable* that there was probable cause for arrest—that is, . . . reasonable officers could disagree as to the legality of the arrest[.]" *Rosenbaum v. Washoe County*, 663 F.3d 1071, 1076 (9th Cir. 2011) (citation omitted).

(affirming dismissal of the plaintiff's false arrest claim on the ground that the officers had probable cause despite the plaintiff's acquittal of a disorderly conduct charge when "[u]niformed police officers arrived in marked cars and told the protesters to stay out of the street or they would be subject to arrest" and "[m]ost of the people present complied and moved onto the sidewalk; however, plaintiff [who denied hearing the order] remained in the street using a bullhorn to lead chants with the protesters who were on the sidewalk"), *rev. denied*, 370 Or. 789 (2023); *Mims v. City of Eugene*, No. 6:02-cv-06099-HO, 2003 WL 23671157, at *6 (D. Or. Sept. 16, 2003) ("Here, however, [the officer] had probable cause to arrest plaintiff and therefore restraint on plaintiff's freedom of movement was not unlawful. [The officer] was informed on his way to the scene of the march that members of the crowd had disobeyed orders to disburse. . . . [The officer] reasonably believed that plaintiff congregated with other persons in a public place and refused to comply with a lawful order of the police to disperse. No other reasonable conclusion can be made concerning [the officer]'s objective belief that plaintiff had committed the crime of disorderly conduct."), *aff'd*, 145 F. App'x 194 (9th Cir. 2005); *cf. Ahern v. Kammerer*, No. 3:21-cv-00561-YY, 2024 WL 4368276, at *3 (D. Or. Sept. 3, 2024) ("[H]undreds of protestors . . . were blocking traffic, lighting smoke bombs, and fighting in the street, all of which would provide probable cause for disorderly conduct." (citing OR. REV. STAT. § 166.025)), *findings and recommendation adopted*, 2024 WL 4368226 (D. Or. Oct. 1, 2024).

### 3.    Retaliation

Roe alleges in claim III that he "was engaged in constitutionally protected acts of free speech" and that Flohr, Dyk, and Ross retaliated against him "[b]y targeting and using force

against [Roe]" that "chilled his political speech and violated his First Amendment rights."[13] (SAC ¶¶ 43-44.) Roe's counsel clarified at oral argument that Roe is now only asserting a retaliatory assault claim. *Cf. Roe*, 2024 WL 3888705, at *14 (noting that "[Roe] argues that he has alleged a claim for both retaliatory arrest and retaliatory assault" based on nearly identical allegations).

Defendants move for summary judgment on Roe's First Amendment retaliation claims on four grounds. (*See* Defs.' Mot. at 24-28.) First, Defendants argue that "[Roe] was not engaged in protected speech by the time these events took place." (*Id.* at 25.) Second, "there is no evidence of any retaliatory animus." (*Id.*) Third, "the officers were acting on probable cause."[14] (*Id.*) Fourth, Defendants argue that the individual defendants are entitled to qualified immunity. (*See id.* at 26-28.)

Roe did not respond to Defendants' arguments for summary judgment on his First Amendment retaliation claims.[15] (*See generally* Pl.'s Resp.; *cf. id.* at 7-8, "Because genuine disputes of fact exist . . . Defendants are not entitled to summary judgment on the Fourth Amendment excessive force or false arrest claims. In addition, a jury could find that the City of Portland is liable under *Monell*[.]"; *id.* at 14-16, only providing the legal standards relevant to Roe's excessive force and false arrest claims; *id.* at 49, requesting only that "Defendants' motion

---

[13] Roe appears to have clarified in his deposition that the constitutionally protected act of free speech at issue was his drumming. (*See* Burgess Decl. Ex. 4 at 98:3-12.)

[14] In light of Roe's counsel's clarification at oral argument that Roe's retaliation claim is based on the officers' uses of force and not the arrest, the Court finds that Defendants' probable cause argument is inapplicable.

[15] Roe makes only a passing reference within his argument addressing the excessive force claims that he "was playing a drum—an act of expressive conduct that falls within the protections of the First Amendment." (Pl.'s Resp. at 19.)

for summary judgment . . . be DENIED as to the Fourth Amendment excessive force[,] false

arrest claims" and "[t]he *Monell* claim against the City of Portland[.]")

Importantly, Roe did not address Defendants' arguments relating to qualified immunity

on his retaliation claim, nor did he address retaliatory animus. (*See generally id.*; *see also id.* at

29-35, arguing only that the officers are not entitled to qualified immunity relating to Roe's

"Excessive Force" and "False Arrest" claims.) When the Court asked at oral argument whether

Roe was abandoning his First Amendment claims, Roe's counsel clarified that he did not intend

to concede the claims and that he did not directly address the First Amendment claims in his

response because Defendants failed clearly to raise or articulate a challenge to Roe's First

Amendment claims.

The Court disagrees. (*See* Defs.' Mot. at 24-25, section five of Defendants' motion was

titled "Plaintiff's claim of First Amendment retaliation in Count III . . . should be dismissed as

probable cause justified the arrest and there is no evidence of retaliatory animus" and included

arguments relating to three distinct grounds on which Defendants moved for summary judgment

on Roe's First Amendment claims; *id.* at 26-28, "Plaintiff's claims against the individual officers

in Counts I, III, and IV of the Second Amended Complaint should be dismissed, as the officers

are entitled to qualified immunity.")

Courts have consistently "held that a plaintiff has 'abandoned . . . claims by not raising

them in opposition to [the defendant's] motion for summary judgment." *Shakur v. Schriro*, 514

F.3d 878, 892 (9th Cir. 2008) (quoting *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4

(9th Cir. 2005)); *see also Coleman v. Bank of New York Mellon*, 798 F. App'x 131, 132 (9th Cir.

2020) ("[The plaintiff] abandoned his claims . . . by failing to provide any argument regarding

these claims in his opposition to defendants' motion for summary judgment.") (citation omitted);

*Est. of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) ("We affirm the district

court's grant of summary judgment on the [plaintiff]'s claim for a refund related to the notices of

*lis pendens*. The [plaintiff] abandoned this claim by failing to raise it in opposition to the United

States' motion for complete summary judgment.") (citations omitted); *Long v. Pend Oreille*

*Cnty. Sheriff's Dep't*, 269 F. App'x 749, 751 (9th Cir. 2008) ("Appellants abandoned their false

arrest claim by failing to raise it in their opposition to summary judgment.") (citation omitted);

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615 n.1 (9th Cir. 1990) ("We do

not consider this argument because appellants failed to raise it in response to [the defendant]'s

motion for summary judgment in the district court."), *aff'd*, 504 U.S. 451 (1992); *cf. Allen v.*

*Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006) ("[The plaintiff] offers no adequate explanation for

his failure to raise his . . . challenge in the district court; in so doing, he deprived the district court

of an opportunity to address the merits of his claim. '[A] party cannot treat the district court as a

mere ill-placed bunker to be circumvented on his way to this court where he will actually engage

his opponents.'" (quoting *Handa v. Clark*, 401 F.3d 1129, 1132 (9th Cir. 2005))).

       Consistent with this Ninth Circuit authority, the Court finds that it would be inappropriate

to evaluate Defendants' arguments without the benefit of Roe's response and without providing

Defendants with a meaningful opportunity to respond to Roe's arguments. Thus, the Court finds

that Roe abandoned his First Amendment retaliation claims by failing to respond to Defendants'

arguments in his response to Defendants' motion for summary judgment. *See Recycle for*

*Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017) ("During oral argument, [the

plaintiff] argued that the purpose of the Ordinance was to support brick-and-mortar charity

organizations, that is, organizations that run manned storefronts. [The plaintiff] waived this

argument because it never raised it in its briefs, other than in a terse one-sentence footnote.")

(citations omitted), *cert. denied*, 583 U.S. 1039 (2017); *Harger v. Dep't of Labor*, 560 F.3d 1071, 1076 n.9 (9th Cir. 2009) ("[The party] did not distinctly assert [the relevant argument] . . . until his rebuttal during oral argument. . . . [T]he untimely nature of this argument . . . obviates our need to consider it.") (citations omitted), *as amended*, 569 F.3d 898, 900 (9th Cir. 2009); *cf. Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001) ("[The plaintiff] has provided no basis to create a material issue of fact that . . . any effect on her First Amendment activities were anything other than the unintended consequence of an otherwise constitutional use of force under the circumstances."), *cert. denied*, 535 U.S. 997 (2002).

For these reasons, the Court grants Defendants' motion for summary judgment on Roe's First Amendment retaliation claims.

## CONCLUSION

For the reasons stated, the Court GRANTS Defendants' motion for summary judgment (ECF No. 83).

**IT IS SO ORDERED.**

DATED this 11th day of September, 2025.

_Stacie F. Beckerman_
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 54 – OPINION AND ORDER